ROGERS, Circuit Judge,
dissenting:
In issuing a citation to the National Cement Company of California for failing to install berms or guardrails along its access road, the Secretary of Labor relied on the jurisdiction of the Mine Safety and Health Administration under the plain text of the definition of a “mine” under section 3(h)(1)(B) of the Federal Mine Safety and Health Act of 1977 (“Mine Act”), 30 U.S.C. § 801 et seq. Today, the court holds that the definition of “mine” is ambiguous and remands this case so that the Secretary may exercise discretion in interpreting her jurisdiction. But there is only one legitimate interpretation of whether the access road is a “private” road “appurtenant to” land from which minerals are extracted, and thus is subject to Mine Act jurisdiction. The Secretary adopted that plain text interpretation and the Federal Mine Safety and Health Review Commission (the “Commission”) unanimously agreed that the literal interpretation of the text was unambiguous. See Sec’y of Labor v. Nat’l Cement Co. of Cal., Inc., 27 F.M.S.H.R.C. 721, 728 (2005); id. at 737-38 (Jordan, Comm’r, dissenting). The court improperly relies upon policy considerations to find ambiguity where there is none.
I.
Under Chevron U.SA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court must give effect to the unambiguously expressed intent of Congress. Under the plain meaning of the terms, the access road is “private” and it is “appurtenant to” land from which minerals are extracted. The history and purpose of the Mine Act fully support the plain text reading and National Cement has offered no reason to avoid the literal meaning.
The Mine Act defines a “mine” to include “an area of land from which minerals are extracted,” 30 U.S.C. § 802(h)(1)(A), and “private ways and roads appurtenant to such [an] area,” id. § 802(h)(1)(B). The parties agree that the cement plant at the end of the access road is “an area of land from which minerals are extracted,” meaning that it is subject to Mine Act jurisdic *1078 tion if it is both “private” and “appurtenant to” the cement plant.
The access road is unambiguously a “private” road. It is located on private property and it is not open to the general public. There is, in fact, a sign posted by National Cement where the access road meets the public state highway that says, in large red lettering, “PRIVATE ROAD NO TRESPASSING” In a statutory provision, words are presumed to have their ordinary, common sense meanings. See, e.g., United States v. Johnson, 529 U.S. 53, 57, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000). As this court has previously recognized, “[i]t is beyond cavil that the common usage of ‘private’ refers to that which is not public or governmental.” Inner City Broad. Corp. v. Sanders, 733 F.2d 154, 158 (D.C.Cir.1984). In determining Mine Act jurisdiction, the Sixth Circuit has taken the natural step of looking to whether a road is “public” as opposed to “private.” See Bush & Burchett, Inc. v. Reich, 117 F.3d 932, 936-38 (6th Cir.1997). The court must engage in tortured reasoning to conclude that in specifying that Mine Act jurisdiction extends only to “private” roads, Congress plausibly may have meant to exclude more than just the natural antonym, “public” roads. As the Supreme Court has acknowledged, “[ajmbiguity is a creature not of definitional possibilities but of statutory context.” Brown v. Gardner, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994); see also Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm’n, 372 F.3d 395, 400 (D.C.Cir.2004). Nothing in the plain text of the Mine Act supports the court’s dissection of the statute in search of ambiguity.
Similarly, by the plain text of the Mine Act, the access road is “appurtenant to” the cement plant. The court suggests that Congress might have been saying something about an operator’s exclusive access to the road by requiring appurtenance. But the common meaning of appurtenance has nothing to do with exclusivity. “An easement is appurtenant to land when the easement is created to benefit and does benefit the possessor of the land in his use of the land.” Restatement (First) of Property § 453 (1944); accord Restatement (Third) of Property: Servitudes § 1.5(1) (2000). It is unsurprising that the court’s anointing of ambiguity in the word “appurtenant” is accompanied by no references to authorities in which appurtenance has been interpreted to require exclusivity. Counterexamples are plentiful.[1] Again, by the ordinary meaning of this term, the road is “appurtenant to” the cement plant because Tejón Ranehcorp has granted National Cement an easement providing a “right of way for the purpose of ingress and egress to and from” the cement plant.
The purpose of the Mine Act fully supports the literal interpretation of the statute supplied by a plain reading of its terms. Congress expressly declared that “the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource^ — -the miner,” 30 U.S.C. § 801(a), noting, among other things, that “the existence of unsafe and unhealthful conditions and practices in the Nation’s coal or other mines is a serious impediment to the future growth of the coal or other mining industry and cannot be tolerated,” id. § 801(d). As part of this initiative, Con *1079 gress defined “mine” in a manner that this court has characterized as “sweeping,” Donovan v. Carolina Stalite Co., 734 F.2d 1547, 1554 (D.C.Cir.1984), and that courts have acknowledged “makes clear that the concept that was to be conveyed by the word [‘mine’] is much more encompassing than the usual meaning attributed to it,” Marshall v. Stoudt’s Ferry Preparation Co., 602 F.2d 589, 591-92 (3d Cir.1979); accord Cyprus Indus. Minerals Co. v. Fed. Mine Safety & Health Review Comm’n, 664 F.2d 1116, 1117-18 (9th Cir.1981).
The legislative history of the Mine Act confirms Congress’s intent. The Conference Committee expressed its intention to adopt a “broad[ ]” definition of what constitutes a “mine” that included “roads ... related to the mining activity.” S.Rep. No. 95-461, at 38 (1977) (Conf. Rep.), reprinted in Senate Subcomm. on Labor, Comm, on Human Res., Legislative History of the Federal Mine Safety and Health Act of 1977, at 1316 (1978) (hereinafter Legislative History). The Senate Committee on Human Resources added further emphasis, clarifying that “all private roads and areas” appurtenant to mineral extraction operations were covered. S.Rep. No. 95-181, at 14 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3401, 3414, reprinted in Legislative History, supra, at 602.
II.
To avoid the literal meaning of the Mine Act, National Cement, Tejón Ranchcorp, and the court suggest that “absurd results” would result therefrom. See Op. at 1075-76. A party seeking to avoid the literal text because of the policy consequences faces “an exceptionally high burden.” Friends of the Earth, Inc. v. EPA, 446 F.3d 140, 146 (D.C.Cir.2006), cert. denied, — U.S. —, 127 S.Ct. 1121, 166 L.Ed.2d 907 (2007). To succeed, such a claim must be accompanied by a showing that “as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it.” Engine Mfrs. Ass’n v. EPA 88 F.3d 1075, 1089 (D.C.Cir.1996). Here, the express purpose and history of the statute indicate that Congress meant precisely what it said. The court concludes that National Cement and Tejón Ranchcorp have “valid” concerns that this interpretation will result in “absurd results,” but this conclusion is flawed.
The “absurd results” doctrine is narrow in order to avoid having courts act as super-legislatures that balance the pros and cons of potential policies. Here, the court adopts the position of the Commission majority that Congress could not have intended a mine “operator” to be liable for what happens on a road for which it lacks complete control. Op. at 1075-76. But as the dissenting Commissioner noted, “[p]er-mitting concerns about future National Cement liability for non-mining related activity to guide the outcome of this case is letting the tail wag the dog.” 27 F.M.S.H.R.C. at 741 (Jordan, Comm’r, dissenting).
The court’s approach adds a requirement of exclusivity to the definition of a “mine” when its true concern is who constitutes an “operator,” which is defined in section 3(d) of the Mine Act, 30 U.S.C. § 802(d). Not only has Congress set only two requirements for roads to be subject to the Mine Act, the necessary inference of which, in tfie absence of legislative intent suggesting otherwise, is that Congress intended no others, cf. TRW Inc. v. Andrews, 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001), nothing suggests Congress acted absurdly by determining, in a separate section, who should be liable for Mine Act violations. If National Cement does not have sufficient control over the access road, then it might not be the “operator” of the access road, as the Secre *1080 tary acknowledges. See Appellant’s Br. at 36-37. But the conclusion to be drawn is not that the access road is beyond the jurisdiction of the Mine Act. The consequences of this reverse inference leave the possibility that a dangerous road covered by the plain text of the statute and referenced in the legislative history will not require berms or guardrails, despite steep drops (up to 25 feet), on a road traversed by heavy cement trucks more than 45,000 times a year.
The court’s related concern that National Cement will be strictly liable for Mine Act violations involving non-mining activities on the access road is resolved similarly. If National Cement does not have the requisite control, then it might not be an operator that can be cited. The facts of this case[2] do not present an occasion to further speculate on how the Act would be interpreted, let alone enforced, should the issue arise. Before the court today is the definition of a “mine,” and the Secretary was correct to conclude that the definition plainly includes National Cement’s access road. A speculative concern about a tiny fraction of access-road users should not be used to uproot the major purpose of the Mine Act.
Finding no ambiguity in the definition of a “mine,” I would remand the case to the Commission for adjudication of the citation on the merits. Accordingly, I respectfully dissent.

. See, e.g., Bush & Burchett, 117 F.3d at 937 (noting that public roads may be appurtenant to extraction facilities); BR Assocs. v. LaFramboise, No. 06-11870-BC, 2007 WL 1840031, at *1 (E.D.Mich. June 26, 2007) (referencing a “non-exclusive easement appurtenant”); Bee Tree Missionary Baptist Church v. McNeil, 153 N.C.App. 797, 570 S.E.2d 781, 783 (2002) (similar); State v. Japage P’ship, 80 S.W.3d 618, 621 (Tex.App.2002) (similar).

. It is undisputed in this court that: (1) the access road on the Tejón Ranch is privately owned; (2) National Cement operates the quarry to which the road provides the only vehicular access; (3) National Cement and Tejón Ranchcorp have entered into a long term lease that gives National Cement an easement, which transfers to successor lessees of the cement plant, to use the road to access the quarry from the state highway and allows National Cement to grant access to others; (4) the lease preserves the right of Tejón Ran-chcorp to use the road and grant easements to others so long as those easements do not materially interfere with National Cement’s operations; (5) National Cement's activities at the cement plant, which operates 7 days a week, dominate use of the access road in that the vast majority of traffic is related to the cement plant and other use of the road, the Administrative Law Judge found, "is dwarfed by National Cement traffic,” Nat’l Cement Co. of Cal., Inc. v. Sec’y of Labor, Mine Safety & Health Admin., 27 F.M.S.H.R.C. 84, 101 (2005); and (6) its heavy trucks traverse the access road hundreds of times a day and accidents have occurred on the road.